FRANK G. HASTINGS *vs.* EDWIN F. STETSON.

Lincoln.    Opinion January 8, 1898.

*Negligence.   Malpractice.   Damages.   Repeating of Instructions.*

Upon a motion for a new trial in a case where the jury returned a verdict against the defendant, a surgeon, for alleged malpractice in treating the plaintiff's dislocated shoulder, the court *holds;* that the plaintiff has established, by a fair preponderance of the evidence, that the defendant did not exercise the care and skill which the law requires in diagnosing the injury; and that the long delay before the dislocation was reduced, was the proximate cause of the paralysis, from which the plaintiff suffers; and that the defendant is in fault for that delay.

In estimating damages for such an injury, much must be left to the sound judgment of the jury; and in this case the court is unable to say that the jury erred.

Where a requested instruction that is sound has already been given, and its repetition at the close of the charge, instead of aiding is likely to mislead, *held;* that it may be properly refused.

ON MOTION AND EXCEPTIONS BY DEFENDANT.

The case is stated in the opinion.

*C. E. & A. S. Littlefield*, for plaintiff.

*W. H. Hilton and O. D. Baker*, for defendant.

SITTING: FOSTER, HASKELL, WISWELL, STROUT, SAVAGE, JJ.

STROUT, J.   This is a suit for alleged malpractice, as a surgeon. Plaintiff was thrown from his carriage in the afternoon of November 6, and suffered a sub-glenoid dislocation of his right shoulder. The defendant, a practicing physician and surgeon, was called, and was in attendance within a very short time thereafter,—examined the patient that evening and the next morning.   He then complained of pain in the shoulder and arm, and thought his arm was broken, or out of joint, and so told defendant.   The defendant attended the plaintiff till November 18.   On the twelfth day after the injury, Dr. Stetson says he discovered that the shoulder was dislocated.   He then told the plaintiff that he " had got to give him ether and see what the trouble with the arm was and fix it." The testimony of several surgeons called in the case, is that the sub-glenoid dislocation is easy of detection, that there is no difficulty in its diagnosis.   In that dislocation the head of the bone is out of its socket, and rests in the axilla.   The effect is a flattening of the deltoid muscle, easily discerned by touch, and the head of the humerus can readily be felt by the hand, in its unnatural position.   If the defendant had exercised the care the law requires of a surgeon, he could and ought to have ascertained the fact of dislocation before the lapse of twelve days.   The evidence justified the jury in its finding that defendant was guilty of negligence in the case.   But he is responsible only for the consequences of that negligence.

The dislocation was reduced on November 20, by another surgeon.   Nearly complete paralysis of the arm and hand had resulted before the reduction.   The plaintiff claims that this was caused by the head of the humerus resting upon and pressing the brachial plexus, a network of nerves in the armpit, for twelve days; and that the defendant's negligence in failing to reduce the dislocation for that length of time, caused the paralysis.   The defendant says the head of the humerus, in that kind of dislocation, does not, and can not rest upon the brachial plexus; and that the paralysis was the result of the blow which dislocated the shoulder,—the head of

the bone, in its progress from the socket, lacerating the nerves of motion and sensation which supplied the arm. This contention is the most serious one in the case.

Many experts in surgery and nerve troubles were examined. Some of them say that, in a sub-glenoid dislocation of the shoulder, the head of the humerus cannot rest upon or press injuriously the brachial plexus, that it is an anatomical impossibility,—that an experiment upon a dead body demonstrates this; while others say, that in that dislocation the head of the humerus would rest upon the brachial plexus. All admit that pressure upon a nerve, if of sufficient force and continued for a sufficient time, will produce paralysis of that nerve; that it might result from one day's pressure,—quite certainly in a week. The experiment upon a dead body is not satisfactory. There must be a difference in the action of a living, sensitive muscle, from that of a dead one. It is common knowledge that, in any disturbance of the joints, the muscles have a potent and active action. If one muscle is injured and weakened, an opposing muscle in full power may draw the misplaced bone into a different position from that it would be in, if all the muscles acted with normal force. Some of the experts called by defendant, who have had large and long experience, say that in a sub-glenoid dislocation of the shoulder, the head of the humerus does not ordinarily rest against the brachial plexus; but they admit that it sometimes does, but not frequently. They give the opinion that the paralysis in this case was caused by the original blow,—an injury to the nerves then received;— while others of equal experience, attribute the paralysis to the long continued pressure of the bone upon the brachial plexus, before reduction of the dislocation. All agree, however, that if the original blow caused the injury to the nerves which resulted in paralysis, that result would be immediate upon the injury, or within an hour after it. The preponderance of the evidence is, that the paralysis in this case was not immediate. It appears to have shown itself to some extent a day or two after the injury, and to have progressed from that time forward. Since the reduction of the dislocation, it has improved to some extent. As we understand the experts, the

theory that the original blow caused the paralysis, is based upon the development of paralysis immediately thereafter. If it was developed several days after, that theory would not be entertained by them, but some other cause must be found. In such case, the diagnosis would indicate pressure upon the nerves continued long enough to produce the result. The experts say that "dislocation is comparatively rarely accompanied by nerve injuries," and that paralysis rarely results from a dislocation of this kind. They all agree that the dislocation should be reduced as soon as possible. It is only in extreme cases of effusion of blood, or great inflammation, that delay is excusable. One of the experts says he had seen "three cases where considerable paralysis was experienced from the dislocation being unreduced." Another expert of large experience says he had not seen such a case.

The question appears to be incapable of demonstration. It must rest upon professional opinion, based upon anatomical learning and experience. The experts differ in opinion as to the cause of the paralysis. Those of them who attribute it to the original blow, base their opinion upon the assumed fact that the paralysis immediately followed the injury; but we think the evidence shows that it came on gradually for several days after the injury. If so, some other cause than the original blow must be found. This is in accordance with the opinion of the experts.

Without reviewing the testimony further, the court is of opinion, after a careful examination of all the evidence, that the plaintiff has established, by a fair preponderance of the evidence, that the defendant did not exercise the care and skill which the law requires, in diagnosing the injury; and that the long delay before the dislocation was reduced, was the proximate cause of the paralysis, from which the plaintiff suffers; and that the defendant is in fault for that delay.

We cannot say that the verdict, which was for $1741.66, is too large. The medical witnesses express the opinion, that there will probably be an improvement in the use of the arm, but give little encouragement of a restored use. The plaintiff is fifty-one years old. The right arm is the one paralyzed. The injury occurred on

November 6, 1895. To this time he has no efficient use of the arm and hand. He can flex the fingers, and partially lift the arm. It is extremely doubtful if he will ever regain an important, practical use of the arm or hand. In estimating damages for such an injury, much must be left to the sound judgment of the jury. Their judgment is entitled to respect. In view of all the facts, we are unable to say that the jury erred.

The motion for a new trial must be overruled.

Upon the exceptions. At the close of the charge, defendant requested that the jury be instructed: "That if the plaintiff's own experts admit that the violence of the original accident could account for the plaintiff's paralysis and all the results now upon him equally well with the delay in setting the bone, then the plaintiff has failed upon that branch of the case, and the plaintiff could not in any event recover damages for the plaintiff's paralysis." The presiding judge declined to give the instruction as requested, saying: "That will only complicate it. I think I will not add anything more. I do not refuse that, excepting that it is not necessary. The jury will remember the testimony of the experts and all the testimony in the case."

The request is faulty in limiting it to the testimony of plaintiff's experts, when it should have included that of all. Careful instruction was given to the jury upon the question whether the paralysis was caused by the original blow, or resulted from the delay in reducing the dislocation and a pressure of the head of the humerus upon the brachial plexus. They were instructed that the plaintiff could not recover damages for the paralysis if it was caused by the original blow; that the burden was upon the plaintiff to satisfy them, by a preponderance of the evidence, that the fault and neglect of the defendant was the cause of the paralysis. Their attention was called fully to the testimony of the experts upon each side, their various opinions and reasons therefor; and it was submitted to the jury in a peculiarly lucid manner to determine the fact. The rights of both parties were carefully preserved. So far as the requested instruction was sound, it had already been

given. Its repetition at the close of the charge, instead of aiding, was likely to mislead. It was properly refused.

*Motion and exceptions overruled.*